## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00205-DLF** |
| **v.** | : | |
| | : | |
| **MARISSA A. SUAREZ,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Marissa A. Suarez ("Suarez") to a 14-day term of imprisonment, as a condition of her probation, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.       Introduction

The defendant, Marissa A. Suarez, a corrections officer at the Monmouth County Sheriff's Office in New Jersey, and co-defendant, Patricia Todisco, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On May 2, 2022, Suarez pleaded guilty to a single count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of a 14-day term of imprisonment, as a condition of her probation, with probation to follow, is appropriate in this case because Suarez: (1) filmed the scene outside of the Senate Wing doors when the rioters were forcing their way into the Capitol; (2) entered the Capitol via the Senate Wing doors after watching other force their way into the Capitol; (3) was, as a trained corrections officer, keenly aware of the dangers that her and other rioters' presence at the Capitol posed to law enforcement and members of Congress that day; (4) wandered through the building and took video on her mobile telephone of other rioters dancing in celebration of the riot inside the Crypt; (4) joined in chants celebrating and justifying the riot (e.g., chants of "Our House," referring to the Capitol as property of the rioters); and (5) celebrated the attack in the Capitol in text messages she sent following the riot.

Even if she did not engage in violence during the riot, Suarez' presence, and chanting support to other rioters who acted more aggressively on January 6 than she did, encouraged and celebrated the violence of the day.   The Court must also consider that Suarez' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed.  Here, Suarez' participation in a riot that actually succeeded in halting the Congressional certification, combined with her social media posts in celebrating and endorsing the violence on that day, make a sentence of a 14-day term of imprisonment, as a condition of her probation and 36 months of probation, both necessary and appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 48 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Suarez' conduct and behavior on January 6.

*Marissa Suarez' Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Marissa Suarez and Patricia Todisco traveled to Washington, D.C. from Union Beach, New Jersey to attend the "Stop the Steal" rally.  Suarez, a corrections officer who was scheduled to work at the Monmouth County (New Jersey) Corrections Facility on January 6th, requested an emergency holiday to attend the rally in Washington, DC.  Suarez traveled to New York to pick up co-defendant Todisco.  Both women attended the "Stop the Steal" rally in D.C.

Thereafter, Suarez and Todisco followed the crowd to the United States Capitol building, and recorded much of what was happening on their mobile devices.  Near the west side of the Capitol, Suarez recorded rioters climbing the walls and breaching scaffolding to access the Capitol and .  *See* Images 1 and 2 both from Exhibit 1.

 

*Image 1:  Rioters climbing wall*                    *Image 2:  Breaching Scaffolding*

Todisco admitted that before entering the Capitol "she saw other rioters breaking the windows and doors of the Capitol and then forcing their way into the Capitol."  ECF 45 ¶ 9.  Suarez filmed the scene outside the Senate Wing area showing a crowd forcing its way into the building.  *See* Image 3 from video Exhibit 2 and Image 4 from video Exhibit 3.

 

Images 3 and 4:  Rioters outside Senate Wing door area, Suarez' videos

In Suarez' videos of the scene, Suarez can be heard referring to Patricia Todisco as "Tish" and stating, "'this is what they fucking wanted, this is what they fucking wanted, this is what they get.'" ECF 48 and ECF 45 ¶ 8.  Both Suarez and Todisco explain that the 'they' in Suarez' statement "is a refence to members of Congress and 'what they get' is a reference to the storming of the Capitol." *Id.*

Both Suarez and Todisco entered the Capitol at approximately 3:06pm through the Senate Wing Door.  *See* Images 5 and 6.



*Image 5:  Suarez enters the Capitol at 3:06pm*



*Image 6: Todisco enters the Capitol at 3:06pm*

In the image below, Suarez wearing a brown winter hat with a small beige patch and matching scarf, and Todisco, wearing a dark-colored winter hat with a light-colored puff on top are both filming or recording the scene with their cellular telephones.  *See* Image 7.



*Image 7:  Suarez and Todisco with mobile devices inside the Capitol*

As Suarez and Todisco made their way into the Senate Wing door entrance, they joined other rioters in chants of " U.S.A."   Todisco's mobile telephone video recorded these chants. *See* Exhibit 4. That video also shows persons entering the Capitol through a window, and shattered glass from the smashed-in window on the floor.  *See* Images 8 and 9. Suarez's video of this area shows a crowd standing around a pile of overturned furniture.  *See* Image 10 and Exhibit 3.

  

*Image 8: Entering Window*        *Image 9: Shattered Glass*        *Image 10:Overturned Furniture*

In their January 6 video recordings, Suarez and Todisco are heard chanting along with other protestors, and laughing or celebrating their actions on that day.   Both of them joined the chants of "Our House" and "U.S.A." while recording the scene on their mobile phones.   In one  video, Suarez can be heard joining others in "Stop the Steal" chants. *See* ECF 48 ¶ 9.   Both Suarez and Todisco supported the belief that the 2020 Presidential election was stolen. Todisco later stated and admitted in her plea colloquy that "she entered the Capitol 'for one simple fact, that the election was rigged and stolen."   *See* ECF 45 ¶ 9.

From the Senate Wing door entrance, Suarez and Todisco traveled through the Crypt. In the image below taken from one of Todisco's recordings of the Crypt, Suarez is seen filming another rioter as he dances and parades in the Capitol.  *See* Image 11 from Exhibit 6.   In their videos, both Suarez and Todisco are enthusiastic about being inside the Capitol as both are heard laughing and participating in chants of "Our House."  *See* Exhibits 5, 6, and 7.



*Image 11:  Celebrating Inside the Capitol*

After exiting the Crypt, Todisco and Suarez separately wandered through the Capitol. Todisco was recorded entering Senator Merkley's office and Suarez was not.

Suarez and Todisco each spent approximately 28 minutes inside of the Capitol. Both Suarez and Todisco have admitted that they knew at the time they entered the Capitol Building that they did not have permission to do so, and admitted while inside the Capitol, they paraded, demonstrated, or picketed. After exiting the Capitol, Suarez and Todisco remained on the grounds or nearby area until officers in riot gear arrived to clear the area.

*Suarez' Statements*

On January 22, FBI agents searched Suarez' and Todisco's cellular telephones or mobile devices pursuant to warrant. The recovered messages showed that Suarez' and Todisco's decision to travel to DC for the Trump rally was not finalized until January 5th. Their respective text messages show they participated in the breach of the Capitol. The following are some of Suarez' messages.

On January 6, 2021, at approximately 3:20pm, Suarez texted, "Sooo we've stormed Capitol Hill lol." And at 3:23 PM and 3:26 PM on January 6, 2021, Suarez celebrated her actions, claiming, "Everyone stormed the capitol lol" and joked, "We're inside hahaha." On January 7, 2021 at 9:57 AM, Suarez stated, "When we found out pence fucked us, we all stormed the Capitol building and everyone forced entry and started breaking shit...it was a like a scene out of a movie" In another message sent on January 7th at 10:04am, was accompanied with a video from outside the Senate wing doors, Suarez noted, "everyone forcing in."

In a January 7, 2021 message sent at 10:06 AM, Suarez claimed, "the cops started tear gassing... then they let us in again... and once we saw they were letting us in without force, trish and I went in. And then apparently the 16-year-old got shot not long before. Pelosi and Pence snuck out via Secret Service and everyone else was ducking in their lounge like we had guns even though we

didn't."  Suarez described her breach of the Capitol as fun, as noted on a January 7, 2021 message sent at 10:07 AM, "Then once the fun was over inside and no one wanted to try to breach where the senate was, then trish and I left and then it got crazy."  In a January 7, 2021 message sent at 10:09 AM, Suarez claimed they left the Capitol grounds, or nearby area once riot police arrived, "Then the cops showed up for riot control and that's when it got fucked. The governor issued a 6pm curfew."

Suarez voluntarily agreed to an interview with the FBI after her arrest on January 22, 2021. During this interview, Suarez admitted that she entered the Capitol on January 6th and identified herself in Capitol Police surveillance photographs. Suarez admitted it was a stupid thing to do, and claimed to be willing to help or  cooperate with the government.

*The Charges and Plea Agreement*

On January 19, 2021, Marissa Suarez was charged by complaint with violating 18 U.S.C. §§ 1752(a) and 40 U.S.C. §§ 5104(e)(2). On January 22, 2021, she was arrested in the District of New Jersey. On March 10, 2021, Suarez was charged by five-count Indictment with 18 U.S.C. § 1512(c)(2), 18 U.S.C. §§1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2) (D) and (G). On May 2, 2022, she pleaded guilty to Count Six: Parading, Demonstrating, or Picketing in a Capitol Building a violation of 40 U.S. C. § 5104(e)(2)(G). By plea agreement, Suarez agreed to pay $500 in restitution to the Department of the Treasury.

**III.    Statutory Penalties**

Suarez now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Suarez faces up to six months of imprisonment and a fine of up to $5,000. Suarez must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this petty misdemeanor case, the Sentencing Guidelines do not apply and sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense,  § 3553(]a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Suarez' individual conduct, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Suarez personally engaged in violence or property destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Todisco's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish her from most other misdemeanor defendants.

Suarez' recording of rioters breaking into the Capitol and her decision to enter and happily participate in a violent riot that she terms as "fun" is especially concerning because Suarez was then a corrections officer undoubtedly aware of the danger her presence caused to officers and others. Furthermore, Suarez' participation ensured the delay of the certification of the 2020 Electoral College vote count and threatened the peaceful transfer of power after the 2020 Presidential election.  Suarez' who had seen others break into the Capitol, chanted and laughed while traipsing through the building, apparently celebrating the riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for the requested sentence in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Suarez has no criminal history.  Suarez is 33 years old, employed as a sales manager, and working towards a Master of Business Administration degree.  At the time of the offense, Suarez was a corrections officer at the Monmouth Cunty Sheriff's Office in Freehold, New Jersey.  The defendant has no children.  Since January 2021, Suarez has, other than a failure to check-in via weekly telephone calls with pretrial, been compliant with pretrial  release conditions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a custody sentence. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Mariposa Castro,* 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.")(statement of Judge Walton at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.")

14

(Statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Suarez' actions on January 6th clearly demonstrate the need for specific deterrence. The government believes that end can be achieved with a sentence of a 14-day term of imprisonment, as a condition of her probation, and probation.  On January 6th, Suarez entered the Capitol knowing she was not supposed to; she laughed and chanted while inside the Capitol, celebrating the breach and the violence of the day.  Neither Suarez of Todisco are known to have committed acts of violence or obstruction, and since her arrest in January 2021, Suarez has been compliant with conditions of pretrial release with the exception of missed check-in calls.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (Statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Suarez has pleaded guilty to Count Six of the Indictment, charging her with parading, demonstrating, or picketing in the Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

---

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged

17

as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants with a background in law enforcement to incarcerations sentences. Once such sentence to consider as a reference is that of Tam Pham (21-cr-109-TJK) who like Suarez pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).

In *United States v. Tam Pham*, 21-cr-109 (TJK), the Court imposed a sentence of 45 days of incarceration, a $1,000 fine, and $500 of restitution. Like Suarez, Pham entered the Capitol, and yelled his support for the riot (for example, "We're taking the house back!"). Pham was inside the Capitol for about 20 minutes—8 minutes less than Suarez—and, unlike Suarez but like co-defendant Todisco, he entered the office suite of a member of Congress. In a pre-arrest interview, Pham falsely told the FBI that he had not entered the Capitol, before being confronted with deleted photos he had taken inside the Capitol. To Suarez' credit, she admitted that she entered the Capitol in her post-arrest interview. Additionally, both Pham and Suarez were part of law enforcement at the time they participated in the riot, Suarez a corrections officer and Pham a police officer. As a police officer with 18-years' experience, Pham's conduct was viewed more egregious. Considering the mix of factors, the sentence requested for Suarez would avoid unwarranted sentencing disparities.

Additionally, the Court should also consider the sentence to be imposed on co-defendant Patricia Todisco, who is scheduled to be sentenced along with Suarez on July 12, 2022. Although they participated in the Capitol Riot together, there are some important differences between Suarez and Todisco. Suarez was the instigator who encouraged Todisco to accompany her to the Trump rally. Suarez drove from New Jersey to New York on the early morning hours of January 6th to pick

18

up Todisco on time to make the DC rally.  Although both entered the Capitol—Suarez was the first to enter, only Todisco is known to have entered Senator Merkley's office.  Both Suarez and Todisco demonstrated inside the Capitol.  Both Suarez and Todisco celebrated their participation in the attack on the Capitol by chanting and laughing.  Accordingly, although Todisco's conduct can be viewed as more egregious—entering Senator Merkley's office—the government recommends each be sentenced to a 14-day term of imprisonment, as a condition of her probation, 36 months' probation, 60 hours of community service, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.    This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.**

This Court has the authority under 18 U.S.C. § 3561(a)(3) to impose a "split sentence," i.e., a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by

the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence). But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-

day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).   A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) (D.D.C. June 2, 2022) ECF 43  (same).    No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.   For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Marissa Suarez to a 14-day term of imprisonment, as a condition of her probation, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/Gracie Lindberg*
Graciela R. Lindberg
TX Bar No. 00797963
Assistant United States Attorney
11204 McPherson Road, Suite 100A
Laredo, Texas 28045
Office: 956-721-4960
graciela.lindberg@usdoj.gov